```
United States District Court
Southern District of New York
```
_____

GRAND MANOR HEALTH RELATED FACILITY,
INC.,                                          12 Civ. 4916 (JGK)

                Plaintiff,              OPINION AND ORDER

      - against -

HAMILTON EQUITIES INC., HAMILTON
EQUITIES COMPANY, ROBERT NOVA, AND
SUZAN CHAIT-GRANDT,

                Defendants.

_____

HAMILTON EQUITIES INC., HAMILTON
EQUITIES COMPANY, ROBERT NOVA, SUZAN
CHAIT-GRANDT, MACRON & COWHEY, P.C.,
AND JOHN MACRON,

      Interpleader Plaintiffs,

      - against -

THE UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT AND
BERKADIA COMMERCIAL MORTGAGE, LLC,

      Interpleader Defendants.

_____

HAMILTON EQUITIES INC. AND HAMILTON
EQUITIES COMPANY,

        Third Party Plaintiffs,

      - against -

THE UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT AND
BERKADIA COMMERCIAL MORTGAGE, LLC,

        Third Party Defendants.

_____

**JOHN G. KOELTL, District Judge:**[1]

The parties have brought five separate motions relating to:
first, a lease between the plaintiff-lessee Grand Manor Health
Related Facility, Inc. ("Grand Manor") and defendants-property
owners Hamilton Equities Company, Hamilton Equities Inc., Robert
Nova, and Suzan Chait-Grandt (collectively "Hamilton Equities");
and, second, two regulatory agreements, one between the United
States Department of Housing and Urban Development ("HUD") and
Grand Manor, and another between HUD and Hamilton Equities
Company.  The issues in this case revolve around funds that were
disbursed, allegedly improperly, to Hamilton Equities by
Berkadia Commercial Mortgage, LLC ("Berkadia"), Hamilton
Equities' mortgagee, at the direction of HUD, and the parties'
respective obligations under the lease and the regulatory
agreements.

Grand Manor argues that it is entitled to the funds for the
improvement of a fire and sprinkler system for the nursing home
that it operates on the property.  Hamilton Equities claims that
it is entitled to the funds under the lease.  While the case
originated in state court, it was removed to this Court after
HUD was added as a party.  As a result of the current motions,
it is clear that HUD must be dismissed as a party and that there

---

[1] As will be discussed further below, the caption of this case
has been amended to reflect the actual litigating positions of
the parties.  The docket sheet caption should be amended to
reflect these changes.

is no longer a basis for federal subject matter jurisdiction.
The original state law claims must therefore be remanded to
state court.

## I.

The following facts are undisputed, unless otherwise noted.

## A.

Hamilton Equities is the owner of the property at 700 White
Plains Road, Bronx, New York.  (HUD R. 56.1 Stmt. ¶ 1; Hamilton
Equities' Resp. R. 56.1 Stmt. ("HE Resp.") ¶ 1.)[2]  On July 30,
1974, Hamilton Equities, Inc., entered into a lease agreement
with Saul Liebman and Bert Liebman,[3] doing business as Grand
Manor, whereby Grand Manor would lease and operate a New York
state licensed nursing facility on the premises.  (See HUD Mem.
Supp. Mot. Dismiss Interpleader Compl. Ex. A ("Lease"); HUD R.
56.1 Stmt. ¶ 1; HE Resp. ¶ 1; Liebman Decl. ¶ 8[4].)

Hamilton Equities financed the construction of the project
through the Federal Housing Administration's loan guarantee

---

[2] The Rule 56.1 statements are from the Motion by HUD and
Berkadia to Dismiss the Interpleader Complaint or in the
alternative for Summary Judgment.
[3] Hamilton Equities contests that Grand Manor has been assigned
the rights of Bert and Saul Liebman properly.  Whether there was
a proper assignment does not affect the outcome of the pending
motions.
[4] The Liebman Declaration is from Grand Manor's Motion for
Summary Judgment.

program.  (Liebman Decl. ¶ 12.)  That program is now administered by HUD.  (Liebman Decl. ¶ 14.)  On October 4, 1978, HUD and Hamilton Equities entered into a regulatory agreement (the "Hamilton Regulatory Agreement") in consideration of HUD's insurance of the mortgage obtained by Hamilton on the leased property.  (See HUD Mem. Supp. Mot. Dismiss Interpleader Compl. Ex. B ("Hamilton Reg. Agmt."); HUD R. 56.1 Stmt. ¶ 3; HE Resp. ¶ 3.)  Under section 2(a) of the Hamilton Regulatory Agreement, Hamilton Equities is required to make frequent payments into an escrow fund known as the "Reserve For Replacement Fund" ("the Reserve Fund" or "the Fund"):

> [Hamilton Equities] shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee . . . Such funds . . . shall at all times be under the control of the mortgagee.  Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the [HUD] Secretary.  In the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(Hamilton Reg. Agmt. § 2(a); Liebman Decl. ¶¶ 14-15.)

On the same day that HUD and Hamilton Equities entered into the Hamilton Regulatory Agreement, HUD also entered into a regulatory agreement with Grand Manor (the "Grand Manor Regulatory Agreement").  (HUD Mem. Supp. Mot. Dismiss

4

Interpleader Compl. Ex. C ("Grand Manor Reg. Agmt.").)  Grand
Manor entered into the agreement "[i]n consideration of the
consent of the Commissioner to the leasing of the aforesaid
project by Hamilton Equities Company [to Grand Manor] . . . ."
(Grand Manor Reg. Agmt. at 1.)  Section 2 of the Grand Manor
Regulatory Agreement provides that "[Grand Manor] shall make
payments under lease when due."  (Grand Manor Reg. Agmt. § 2.)
Section 3 of the Agreement provides that under certain
circumstances, HUD can require Hamilton Equities and Grand Manor
to renegotiate the amounts due under the lease:

> Payments by the lessee to the lessor shall be
> sufficient to pay all mortgage payments including
> payments to reserves for taxes, insurance, etc.,
> payments to the Reserve for Replacements, and to take
> care of necessary maintenance.  If at the end of any
> calendar year, or any fiscal year . . . payments under
> the lease have not been sufficient to take care of the
> above items, [Hamilton Equities] and [Grand Manor]
> upon request in writing from the Commissioner shall
> renegotiate the amounts due under the lease so that
> such amounts shall be sufficient to take care of such
> items . . . ."

(Grand Manor Reg. Agmt. § 3.)  Section 4 further provides that
Grand Manor "shall not sublease the project . . . without
consent of [HUD]."  (Grand Manor Reg. Agmt. § 4.)  Section 10 of
the Grand Manor Regulatory Agreement provides that "[t]he lease
may be cancelled upon thirty days written notice by the
Commissioner given to the lessor and the lessee for a violation
of any of the above provisions unless the violation is corrected
. . . within said thirty day period."  (Grand Manor Reg. Agmt.

§ 10.)  Hamilton Equities is not a signatory to the Grand Manor Regulatory Agreement.

On August 28, 1978, Hamilton Equities and Grand Manor executed an amendment to the lease.  (HUD Mem. Supp. Mot. Dismiss Interpleader Compl. Ex. D ("Lease Am.").)  The Lease Amendment provides that contributions to the Reserve Fund are to be split between Grand Manor and Hamilton Equities:

> [T]he parties hereto agree that so long as an escrow fund is required . . . [the lessor and lessee] will contribute to the fund on a monthly basis as follows: (i) Two-thirds of such required monthly payments shall be paid by [Grand Manor]; and (ii) One-third of such monthly payment shall be paid by [Hamilton Equities].

(See Lease Am. § 25.1.)  The agreement vests the right to withdraw money from the Fund with Grand Manor "for the purposes for which such fund is established" but provides that "at the time [Grand Manor] shall withdraw any amount from [the Reserve Fund] . . .  it shall pay over to [Hamilton Equities] within ten days from such withdrawal one-third of the amount withdrawn." (Lease Am. § 25.2.)  Furthermore, the Lease Amendment provides that "[i]n the event of any inconsistency with respect to the terms, provisions and conditions of this Agreement and the . . . HUD regulatory agreements, the . . . HUD regulatory agreements will prevail and govern the rights of the parties."  (Lease Am. § 27.1.)

Berkadia is the successor mortgagee to the mortgage with Hamilton Equities and holder of the Reserve Fund.  (HUD R. 56.1

Stmt. ¶ 10; HE Resp. ¶ 10.)  Section 3 of the mortgage between
Berkadia and Hamilton Equities provides that "the Regulatory
Agreement . . . executed by [Hamilton Equities] and [HUD] . . .
is incorporated in and made a part of this Mortgage.  Upon
default under the Regulatory Agreement and upon the request of
[HUD], the mortgagee, at its option, may declare the whole of
the indebtedness secured hereby to be due and payable."
(Liebman Decl. Ex. 2 ("Mortgage") § 3.)  Section 5 of the
mortgage further provides that "upon default hereunder,
Mortgagee shall be entitled to the appointment of a receiver by
any court having jurisdiction, without notice, to take
possession and protect the property described herein and operate
same and collect the rents, profits and income therefrom . . . ."
(Mortgage § 5.)

### B.

In October 2009, the Centers for Medicare and Medicaid
Services issued regulations requiring all nursing facilities
participating in Medicare and Medicaid programs, including Grand
Manor, to improve their fire alarm and sprinkler systems by
August 2013.  (See Liebman Decl. Ex. 4.)  Grand Manor informed
Hamilton Equities of the need to undertake a fire alarm and
sprinkler improvement project ("the Fire/Sprinkler Project") and
put the project out for bidding.  (See Liebman Decl. ¶ 27.)  The

7

approved winning bidder was G. Fazio Construction Company, Inc. ("G. Fazio"), with a bid of $1,298,837.  (See Liebman Decl. ¶ 27.)  On or about October 4, 2010, Grand Manor applied to HUD to authorize the release of funds from the Reserve Fund to cover the costs of the Fire/Sprinkler Project.  (See Liebman Decl. Ex. 5; HUD R. 56.1 Stmt. ¶ 11; HE Resp. ¶ 11.)

On December 3, 2010, a representative of HUD, Suechen Smith, emailed a representative of Grand Manor and authorized the release of $640,000 from the Reserve Fund.  (Liebman Decl. Ex. 6.)  Ms. Smith indicated that HUD had "agreed to release the [Reserve Funds] requested to upgrade the fire alarm and sprinkler systems to comply with Federal and State Regulations." (Liebman Decl. Ex. 6.)  Ms. Smith explained that HUD planned to authorize Berkadia, the mortgagee and holder of the Reserve Fund, to release $213,334 to Hamilton Equities and $426,666 to Grand Manor "in accordance with the executed 1978 lease, Section 25.2." (Liebman Decl. Ex. 6.)  Her email to Grand Manor indicated that HUD had instructed Berkadia to release the authorized funds to G. Fazio "upon receipt of an approved invoice from [Grand Manor]." (Liebman Decl. Ex. 6.)

On December 6, 2010, Ms. Smith informed Berkadia of the authorization to release the Reserve Funds.  (Liebman Decl. Ex. 7 at 2.)  She indicated that "Mr. Robert Nova [of Hamilton Equities] has agreed to release the [Reserve] [F]unds to [Grand

Manor] in accordance with the 1978 lease." (Liebman Decl. Ex. 7 at 2.)  Ms. Smith asked Berkadia to issue two checks, one to Hamilton Equities for $213,334 and another to G. Fazio for $426,666 "after [HUD] provide[s] you a copy of the approved invoice upon receipt from [Grand Manor]." (Liebman Decl. Ex. 7 at 1.)  A representative of Berkadia replied that it would only issue one check, to Mr. Nova, and that Hamilton Equities would "have to issue the other check directly to G. Fazio construction." (Liebman Decl. Ex. 7 at 1.)  Ms. Smith replied, "[p]lease release [$426,666 to G. Fazio Construction Co., Inc.] after I provide you a copy of the approved invoice upon receipt from [Grand Manor]." (Liebman Decl. Ex. 7 at 1.)  Subsequently, Berkadia released the full amount, $640,000, to Hamilton Equities.  (HUD R. 56.1 Stmt. ¶ 14; HE Resp. ¶ 14.)  Hamilton Equities kept $213,334 of the released funds and gave the other $426,666 to its attorney to hold in escrow.  (Liebman Decl. ¶ 34; Liebman Decl. Ex. 8.)

Grand Manor did not initially receive any of the released funds.  From 2011 through 2012, while the Fire/Sprinkler Project was underway, Grand Manor made several alleged attempts to collect the funds from Hamilton Equities and HUD.  (Liebman Decl. ¶ 37.)  On April 19, 2012, Grand Manor submitted invoices to HUD and requested that HUD instruct Hamilton Equities to release the funds to Grand Manor for use towards the

Fire/Sprinkler Project. (Liebman Decl. Ex. 10.) By letter
dated June 14, 2012, HUD sent the invoices to Hamilton Equities
and instructed Hamilton Equities to turn over the entire
$640,000 to Grand Manor within 5 days. (Liebman Decl. Ex. 11.)
After an exchange between HUD and Hamilton Equities, HUD issued
an amended letter in which it reiterated that all of the
released funds were to be paid to Grand Manor within 5 days, or,
"[i]f they are not used for the [Fire/Sprinkler Project], they
need to be returned to Berkadia to be placed back into the
Reserve for Replacement Account within the 5 days." (Liebman
Decl. Ex. 12 at 1.) On June 21, 2012, Hamilton Equities sent a
letter to HUD challenging HUD's assertion that Hamilton Equities
had to turn over the entire $640,000 to Grand Manor. (Nova
Decl. ¶ 21.) Hamilton Equities retained all of the released
funds until July 2012.


                                C.

     Grand Manor and Hamilton Equities have a separate state
court case currently underway relating to whether, among other
things, the assignment of the lease to Grand Manor was valid.
(Am. Compl. ("Third Party Compl.") ¶ 26.) That case was tried
to a court without a jury and a decision is imminent.
     The case in this Court has a complicated procedural
history. First, on or about March 23, 2012, Grand Manor

                                10

commenced an action in the New York Supreme Court, Bronx County against Hamilton Equities, Macron & Cowhey, P.C., and John Macron (collectively, the "Hamilton Parties"). (Liebman Decl. Ex. 9.) In that suit Grand Manor seeks payment of the full $640,000 from the Hamilton Parties. (See, e.g., Liebman Decl. Ex. 9 ¶¶ 82, 97.)

Second, on or about May 18, 2012, the Hamilton Parties filed a purported "Third Party Complaint" against Grand Manor, Garfunkel Wild, P.C., Roy Breitenbach, and Martin Liebman. (Notice of Removal Ex. C.) To the extent the "Third Party Complaint" lists Grand Manor as a third party defendant, the designation is incorrect. Because Grand Manor filed the initial action against the Hamilton Parties, Grand Manor cannot be a third party. The purported "Third Party Complaint" alleges that in the event the Hamilton Parties are liable to Grand Manor in Grand Manor's initial suit, the Hamilton Parties are entitled to common law contribution from Grand Manor, Garfunkel Wild, P.C., Breitenbach, and Liebman. The Court construes the "Third Party Complaint" as a counterclaim against Grand Manor.[5]

Third, on or about May 18, 2012, the Hamilton Parties filed an Interpleader Complaint against HUD and Berkadia. (Notice of

---

[5] The Court also construes the Third Party Complaint as a third party claim against Garfunkel Wild, P.C., Roy Breitenbach, and Martin Liebman (the "Third Party Defendants"). Because, as discussed below, the Third Party Defendants have been dismissed, the claims against the Third Party Defendants are no longer relevant.

Removal Ex. B.)  The Interpleader Complaint sought to deposit $426,666 of the Reserve Funds with the Court for Bronx County. (Notice of Removal Ex. B at ¶¶ 28-29.)  On June 22, 2012, HUD removed the entire case to this Court.  (See Notice of Removal.) HUD removed the case pursuant to 28 U.S.C. § 1442(a)(1), which authorizes removal to federal court of any civil action filed in state court against "[t]he United States or any agency thereof . . . ."  The Court presumably acquired jurisdiction over the initial Grand Manor complaint and the Hamilton Parties' counterclaim through the exercise of supplemental jurisdiction. See 28 U.S.C. § 1367(a).

In July 2012, in response to this Court's request, the parties partially resolved the ownership of the disputed funds and Hamilton Equities provided the "undisputed" $426,666 of the released funds to Grand Manor.  (Liebman Decl. ¶¶ 48-49.)  On or about August 27, 2012, Grand Manor and Hamilton Equities entered into a Stipulation of Partial Voluntary Dismissal.  In the Stipulation, Grand Manor dismissed all claims against Macron & Cowhey, P.C. and John Macron, and Hamilton Equities dismissed all claims against the Third Party Defendants.  (Stip. Partial Voluntary Dismissal, Aug. 27, 2012, ECF No. 13 ("Stip."), at 2.) The Stipulation provided that it could "not be utilized by any party with respect to the matters consolidated for trial now sub

<u>judice</u> in the New York State Supreme Court, Bronx County

. . . ." (Stip. at 2.)[6]

On October 22, 2012, Hamilton Equities Inc. and Hamilton
Equities Company (the "Hamilton Third Party Plaintiffs") filed
an "Amended Complaint" against HUD and Berkadia.[7] Although the
Amended Complaint purported to be a "Supplemental Interpleader
Complaint," the pleading does not seek to resolve issues related
to a limited fund, but rather, seeks a court order to compel HUD
and Berkadia to take certain actions. (<u>See</u> Third Party Compl.
¶¶ 37-42.) Therefore, the pleading is best understood as a
third party complaint against HUD and Berkadia, and hereinafter
will be referred to as the "Third Party Complaint."[8] (<u>See</u> Third
Party Compl.) Grand Manor intervened on consent in the third
party action against HUD and Berkadia.

In the Third Party Complaint, the Hamilton Third Party
Plaintiffs seek a Court order compelling HUD to (1) send Grand

---

[6] Because, as explained, Grand Manor is not a third party
defendant, and because the Third Party Defendants have been
voluntarily dismissed, the Third Party Complaint does not have
any defendants remaining.
[7] The parties do not explain why this Supplemental Interpleader
Complaint was only filed on behalf of the two Hamilton Equities
entities rather than all of the Hamilton Equities parties.
[8] Although the Hamilton Parties filed a purported "Third Party
Complaint" against Grand Manor and the Third Party Defendants,
as explained above, the Third Party Defendants have been
dismissed and the claim against Grand Manor is a counterclaim,
not a third party claim. Therefore, throughout the opinion, any
reference to the "Third Party Complaint" is a reference to the
complaint by the Hamilton Third Party Plaintiffs against HUD and
Berkadia.

Manor a notice under section 10 of the Grand Manor Regulatory Agreement declaring Grand Manor in default and terminating Grand Manor's lease because (a) Grand Manor assigned or subleased the premises without HUD approval and (b) Grand Manor defaulted on paying rent; and (2) order HUD to review Grand Manor's rent payments and "Use and Occupancy" under section 3 of the Grand Manor Regulatory Agreement to ensure that the rent is sufficient to cover the mortgage payments, payments to the Reserve Fund, and maintenance. (Third Party Compl. ¶¶ 37-42.) The Hamilton Third Party Plaintiffs also seek a Court order compelling Berkadia to apply for the appointment of a receiver pursuant to section 5 of the mortgage. (Third Party Compl. ¶¶ 43-44.)

The only remaining funds in dispute are the $213,334 that Hamilton Equities has retained. On October 15, 2012, Grand Manor moved for summary judgment on its initial complaint to compel Hamilton Equities to turn over the disputed funds. On the same day, HUD and Berkadia moved to dismiss, or in the alternative for summary judgment, on the Hamilton Parties' Interpleader Complaint. On December 21, 2012, three additional motions were filed by HUD, Grand Manor, and Berkadia. All three motions sought to dismiss the Third Party Complaint.[9] The

---

[9] No party sought to dismiss the purported Third Party Complaint filed by the Hamilton Parties against the Third Party Defendants and Grand Manor. However because, as will be discussed, the Court declines to exercise supplemental jurisdiction over the state-law claims, that complaint is also dismissed.

motions have all been fully briefed and argued before this
Court.

## II.

HUD and Berkadia have moved to dismiss or, in the
alternative for summary judgment dismissing the Hamilton
Parties' Interpleader Complaint.  However, prior to reaching the
merits of the motion, the Court has an independent obligation to
assure itself that it has the subject matter jurisdiction to
decide the matter.  See College Std. Magazine v. Student Ass'n
of the State Univ. of N.Y., 610 F.3d 33, 35 (2d Cir. 2010) (per
curiam).  Although neither party argued that the Interpleader
Complaint should be dismissed as moot, mootness is an aspect of
subject matter jurisdiction that the Court must raise sua
sponte.  See id. (citing Muhammad v. City of New York Dep't of
Corr., 126 F.3d 119, 122-23 (2d Cir. 1997) (explaining that
mootness is an issue of subject matter jurisdiction the Court
must consider sua sponte)).

"Article III of the Constitution limits federal courts'
authority—that is, our subject matter jurisdiction—to disputes
involving 'live cases and controversies.'"  Cnty. of Suffolk v.
Sebelius, 605 F.3d 135, 140 (2d Cir. 2010) (citing United States
v. Quattrone, 402 F.3d 304, 308 (2d Cir. 2005)).  "A number of
justiciability doctrines govern the contours of this power;

pertinent here is mootness, which concerns when and whether a case is 'live.'" Id. "Specifically, under the general rule of mootness, courts' subject matter jurisdiction ceases when an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party." Id. (quoting Quattrone, 402 F.3d at 308 (internal quotation marks and citation omitted)).

"[I]n order to render an interpleader action moot, a voluntary agreement must effectuate the purpose of interpleader—to shield the plaintiff from multiple liability—such that a judgment in the action can provide no practical relief to the stakeholder." Vincent Metro, LLC v. Yah Realty, LLC, 1 A.3d 1026, 1032 (Conn. 2010) (collecting cases from various jurisdictions and holding interpleader claim not mooted by voluntary agreement of the parties because plaintiff could still be subject to multiple liability); Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Clemente, No. 98 Civ. 1756, 2002 WL 1162901, at *1 (S.D.N.Y. May 31, 2002) ("[B]ecause all the funds have been forfeited to the government, this interpleader action is moot.").

The Interpleader Complaint no longer presents a live controversy. The Interpleader Complaint sought the resolution of the ownership of $426,666. That issue has since been

resolved.  In July 2012, the Hamilton Parties provided the
interpleader funds of $426,666 to G. Fazio Construction. (Tr.
26-29, July 2, 2012.)  Grand Manor, the Hamilton Parties,
Berkadia, and HUD all agreed that the $426,666 should be
distributed to G. Fazio for use towards the Fire/Sprinkler
Project.  (Tr. 29.)  Therefore, there is no longer a live
controversy regarding the proper ownership of the $426,666,
which was the only issue in the Interpleader Complaint.

Grand Manor, Berkadia, and HUD argue in their papers that
although the $213,334 is not explicitly referenced in the
Interpleader Complaint, the issue implicit in the Interpleader
Complaint is the ownership of the disputed funds, and this
includes the $213,334 that the Hamilton Parties continue to
retain.  The parties cite no precedent for their argument, and
it is without merit.  The Interpleader Complaint does not
reference the $213,334.  The Hamilton Parties instituted the
interpleader action because they conceded that they had no claim
to the $426,666.  That amount had been retained in escrow and
the Hamilton Parties did not claim to be entitled to it.  In
contrast, the Hamilton Parties contend that the $213,334 is
their property.  They never sought to deposit that amount into
the Court or to seek any judicial interpretation as to its
ownership.  Although Grand Manor, Berkadia, and HUD have alleged
in their papers that rights to the $213,334 is disputed, their

17

contention does not bring the $213,334 within the ambit of the Hamilton Parties' Interpleader Complaint.  See Empire Healthchoice Assur., Inc. v. McVeigh, 396 F.3d 136, 140 (2d Cir. 2005) ("[T]he plaintiff is generally the master of the complaint . . . . [and] [t]he existence of a federal question must be determined solely by reference to the plaintiff's own claim . . . .") (internal quotation marks and citations omitted).

At the argument of the motions, HUD indicated that it would be satisfied with the dismissal of the Interpleader Complaint as moot.  HUD also indicated that it would be prepared to work with the other parties toward a resolution of their disputes, including attempting to assure that adequate funds are provided for the completion of the Fire/Sprinkler Project.  The parties should certainly work together for a prompt resolution.  That also does not, of course, change the fact that the Interpleader Complaint is moot.  Therefore, the Interpleader Complaint is **dismissed as moot**.[10]

---

[10] Although the Interpleader Complaint is moot, the Hamilton Parties may still seek attorneys' fees.  See Atrium Cos. v. Unite Here!, No. 09 Civ. 8265, 2011 U.S. Dist. LEXIS 99442, at *9-10, adopted, 2011 U.S. Dist. LEXIS 99462 (S.D.N.Y. Aug. 31, 2011).

### III.

HUD, Berkadia, and Grand Manor have moved to dismiss the Hamilton Third Party Plaintiffs' Third Party Complaint against HUD and Berkadia on several different grounds.  Each will be addressed in turn.

### A.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor.  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007).  The Court's function on a motion to dismiss  is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  While the Court should construe the factual allegations

19

in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.; see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009).

## B.

HUD has moved to dismiss the Third Party Complaint which seeks to compel HUD and Berkadia to take various actions against Grand Manor.  HUD argues that the Hamilton Third Party Plaintiffs have no standing to enforce provisions of the regulatory agreement between HUD and Grand Manor, which is the alleged basis for the actions the Hamilton Third Party Plaintiffs seek.  The Hamilton Third Party Plaintiffs argue that they have standing either as third party beneficiaries to the Grand Manor Regulatory Agreement or because the two regulatory agreements should be construed as one contract.  The case against HUD must be dismissed for lack of standing.

Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2.  "In order to ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit." W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008) (internal

quotation marks and citation omitted).  To establish standing, a

plaintiff must show, "an injury-in-fact — an invasion of a

legally protected interest which is (a) concrete and

particularized . . . and (b) actual or imminent, not conjectural

or hypothetical . . . .'"  <u>Carver v. City of New York</u>, 621 F.3d

221, 225 (2d Cir. 2010) (quoting <u>Lujan v. Defenders of Wildlife</u>,

504 U.S. 555, 560 (1992)).[11]  A party cannot claim to have a

legally protected interest in a contract to which it is neither

a signatory nor a third party beneficiary.  <u>See McCall v.</u>

<u>Chesapeake Energy Corp.</u>, 817 F. Supp. 2d 307, 313 (S.D.N.Y.

2011).  The Hamilton Third Party Plaintiffs concede that they

are not signatories to the Grand Manor Regulatory Agreement.

However, they argue that they are third party beneficiaries and

that the two regulatory agreements should be read together as

one contract.

The Hamilton Third Party Plaintiffs are not intended third

party beneficiaries of the Grand Manor Regulatory Agreement.

HUD regulatory agreements are governed by the federal common law

of contracts.  <u>See Cienega Gardens v. United States</u>, 194 F.3d

1231, 1241-42 (Fed. Cir. 1998); <u>Reiner v. West Village</u>

---

[11] Injury-in-fact is only the first requirement.  To have
standing, a plaintiff must also demonstrate "[2]that there was a
'causal connection between the injury and the conduct complained
of'; and [3] that it is 'likely, as opposed to merely
speculative, that the injury will be redressed by a favorable
decision.'"  <u>Carver</u>, 621 F.3d at 225 (quoting <u>Lujan</u>, 504 U.S. at
560).  However, because the plaintiff cannot show an injury-in-
fact, analysis of the subsequent elements is unnecessary.

Associates, 600 F. Supp. 233, 238 (S.D.N.Y.), aff'd, 768 F.2d 31 (2d Cir. 1985).[12]  To enforce a contract under federal law, "a third party must be an intended, rather than an incidental, beneficiary . . . ."  Id. at 239.[13]  "Federal common law, in deciding whether a third-party beneficiary may sue, looks to the same considerations as does the Restatement of Contracts." Rivera v. Bank of Am. Home Loans, No. 09 Civ. 2450, 2011 WL 1533474, at *4 (E.D.N.Y. Apr. 21, 2011) (internal quotation marks and citations omitted).  "Section 302 of the Restatement (Second) of Contracts provides that . . . 'a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'"  Id. (quoting Restatement (Second) of Contracts § 302(1) (1981)).  "Thus . . . a plaintiff claiming to be the intended third party beneficiary of a government contract must show that he was intended to benefit from the contract and that third-party beneficiary claims are

_____

[12] At oral argument, all parties agreed that federal common law governs the HUD regulatory agreements.
[13] New York law also requires that a third party be an intended beneficiary to enforce a contract.  See Cnty. of Suffolk v. Long Island Lighting Co., 728 F.2d 52, 63 (2d Cir. 1984)("It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed.") (citing Lawrence v. Fox, 20 N.Y. 268 (1859)).

consistent with the terms of the contract and the policy underlying it." Id. (internal quotation marks and citation omitted).

Tenants are not generally third party beneficiaries to regulatory agreements between HUD and property owners. See, e.g., Kya-Hill v. Case, 182 F.3d 900 (2d Cir. 1999) (unpublished); Reiner, 600 F. Supp. at 238-39; Feldman v. U. S. Dep't of Housing & Urban Development, 430 F. Supp. 1324, 1328 (E.D. Pa. 1977); Fenner v. Bruce Manor, Inc., 409 F. Supp. 1332, 1349-50 (D. Md. 1976). Although this case presents the inverse scenario, property owners claiming to be third party beneficiaries to an agreement between HUD and a tenant, the reasoning of those cases applies with equal force here. See Reiner, 600 F. Supp. at 238-39. In Reiner, tenants sued HUD and the building owner claiming that the rent they were charged was in excess of the rent agreed to in the regulatory agreement between HUD and the owner. Id. at 238. The district court held that the tenants were not intended beneficiaries of the regulatory agreement and therefore lacked standing. Id. at 239. The court relied in part on the provision of the regulatory agreement that provided HUD with the exclusive remedy for breaches of the regulatory agreement by the owner:

> Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners, . . . . If such violation is not corrected to the satisfaction of the

> Secretary within thirty (30) days after the date such
> notice is mailed or within such further time as the
> Secretary determines is necessary to correct the
> violation, without further notice the Secretary may
> declare a default under this Agreement effective on
> the date of such declaration of default and upon such
> default the Secretary may: [take various other
> action].

Id. at 239 n.16.  The district court held that "the Regulatory

Agreement . . . contains no provision which indicates an intent

contrary to what is expressed in the default paragraph giving

the Secretary the exclusive right to enforce the contract.  [The

court] conclude[s] the tenants are not intended beneficiaries of

the agreement and therefore have no standing to enforce it."

Id. at 239.

    In this case, the Hamilton Third Party Plaintiffs seek to

compel HUD to declare a default under section 10 and/or to take

other actions under section 3 of the Grand Manor Regulatory

Agreement.  However, like the agreement in Reiner, the Grand

Manor Regulatory Agreement vests exclusive rights to declare

default and to require the renegotiation of rent with HUD.

Section 10 of the Grand Manor Regulatory Agreement provides that

"[t]he lease may be cancelled upon thirty days written notice by

the Commissioner . . . for a violation of any of the above

provisions . . . ."  (Grand Manor Reg. Agmt. § 10 (emphasis

added).)  Similarly, section 3 of the Grand Manor Regulatory

Agreement provides that "[i]f . . . payments under the lease

have not been sufficient to take care of the above items, the

lessor and lessee upon request in writing <u>from the Commissioner</u> shall renegotiate the amounts due under the lease." (Grand Manor Reg. Agmt. § 3 (emphasis added).)   These provisions explicitly reserve those powers for HUD.   Therefore, the Hamilton Third Party Plaintiffs are not intended beneficiaries of the Grand Manor Regulatory Agreement and have no standing to enforce it.   <u>See</u> <u>Reiner</u>, 600 F. Supp. at 238-39.

There is no evidence in the Grand Manor Regulatory Agreement that HUD or Grand Manor intended the agreement to benefit the Hamilton Third Party Plaintiffs.   The Hamilton Third Party Plaintiffs argue that because "Hamilton Equities" is specifically named as the mortgagor in the Grand Manor Regulatory Agreement, and because both regulatory agreements are on HUD forms, make reference to one another, and name the mortgagee, they have standing to enforce the Grand Manor Regulatory Agreement.   None of these features demonstrates that the Hamilton Third Party Plaintiffs are intended—rather than incidental—beneficiaries to the Grand Manor Regulatory Agreement.

The Hamilton Third Party Plaintiffs cite no authority and present no persuasive evidence that the purpose of the Grand Manor Regulatory Agreement was to assure that the mortgagor was properly compensated or that the agreements were drafted to operate in conjunction with one another.   The Hamilton

Regulatory Agreement provides that it was entered into "[i]n consideration of the endorsement for insurance by the Secretary . . . ." (Hamilton Reg. Agmt. at 1.)  In contrast, the Grand Manor Regulatory Agreement provides that the agreement was "in consideration of the consent of the Commissioner to the leasing of the aforesaid project by Hamilton Equities Company [to Grand Manor] . . . ." (Grand Manor Reg. Agmt. at 1.)  Both agreements provide that they were entered into in consideration for following HUD's rules and regulations. (Hamilton Equities Reg. Agmt. At 1; Grand Manor Reg. Agmt. at 1.)  There is nothing indicating that either regulatory agreement was designed to benefit any party other than HUD, who had guaranteed the mortgage loan and had a strong interest in assuring that both the owner and lessee abided by HUD regulations, and that HUD would not be required to make any payments on its guarantee.

Furthermore, while each regulatory agreement may be used to determine the meaning of any ambiguous terms in the other agreement, that does not make them one contract that gives a party rights in an agreement to which that party was not a signatory.  See Cienega Gardens, 194 F.3d at 1243.  "Whether multiple writings should be construed as one agreement depends upon the intent of the parties." TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005) (construing New York law) (quoting Commander Oil Corp. v. Advance Food Serv. Equip.,

991 F.2d 49, 52-53 (2d Cir. 1993)).[14]  While the intent of the parties "is typically a question of fact for the jury," where "the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court."  Id.

The contracts should not be construed as one agreement.  As described above, the regulatory agreements were between different parties and were entered into for different reasons. Although the Grand Manor Regulatory Agreement does make reference to the Hamilton Equities Regulatory Agreement (Grand Manor Regulatory Agmt. § 9), that alone is not dispositive.  The intent of the parties, as demonstrated through the agreements, indicates that each was entered into for a different purpose, and therefore the two contracts should not be construed as one contract.  Grand Manor lacks standing to enforce provisions of the Hamilton Equities Regulatory Agreement, and Hamilton Equities lacks standing to enforce provisions of the Grand Manor Regulatory Agreement.

Moreover, while the two contracts can be "read together" for interpretation purposes, there is nothing in the Grand Manor Regulatory Agreement that purports to give any rights to Hamilton Equities to enforce any obligations in the Grand Manor

---

[14] Although federal common law governs the regulatory agreements, the parties agreed at oral argument that New York law may be applied to the issue of whether the contracts should be construed together.

Regulatory Agreement.  See Cienega, 194 F.3d at 1243 ("[W]e
cannot sustain the . . . conclusion that 'when parties in this
case . . . entered into the regulatory agreement they also
intended to be mutually bound by . . . the contemporaneous deed
of trust note."); id. (declining to read obligations into a
contemporaneous agreement because "[t]he documents evidence
separate agreements between distinct parties."); Snyder v. Wells
Faro Bank, N.A., No. 11 Civ. 4496, 2011 WL 6382707, at *5
(S.D.N.Y. Dec. 19, 2011) (holding under New York law that "while
multiple documents executed at the same time and concerning the
same subject-matter are required to be read together under New
York law, this does not mean that . . . any [] particularized
clauses—can be lifted from one document and transferred to
another.") (collecting cases); Coleman Co., Inc. v. Hlebanja,
No. 96 Civ. 1288, 1997 WL 13189, at *7 (S.D.N.Y. Jan. 15, 1997)
(holding under New York law that "even if several contracts that
constitute part of the same transaction are considered one
contract, the different obligations within each contract may be
independent and divisible.").  The rights in the Grand Manor
Regulatory Agreement rest exclusively with HUD.

    Furthermore, the claims must also be dismissed because
Hamilton Equities seeks to compel HUD to take actions that are
discretionary under the Grand Manor Regulatory Agreement.
Hamilton Equities argues, without citing any precedent, that HUD

                              28

has a "regulatory duty" to take actions under the Grand Manor
Regulatory Agreement.  However, HUD has no obligation to resort
to any of the remedies to which it is entitled to under the
Grand Manor Regulatory Agreement.  See St. Christopher Assocs.,
L.P. v. United States, 511 F.3d 1376, 1380 (Fed. Cir. 2008)
(affirming that lower court correctly concluded there was no
basis for a breach of contract claim against HUD because the
provisions the plaintiff relied upon "impose[d] no duty on
HUD."); United States v. Livecchi, 605 F. Supp. 2d 437, 456
(W.D.N.Y. 2009) ("The Agreement did not obligate HUD, however,
to resort to any or all particular remedies or to resort to them
in any particular order.").  Sections 10 and 3 of the Grand
Manor Regulatory Agreement do not require that HUD take any
particular action.  To the contrary, the sections respectively
provide HUD with the discretion to declare a default and to
order renegotiation of the lease.  Because these provisions
grant HUD discretionary authority, Hamilton Equities' claims are
without merit and are **dismissed**.[15]   See St. Christopher, 511
F.3d at 1380; Livecchi, 605 F. Supp. 2d at 456.[16]

---

[15] To the extent that the claims could be construed as a mandamus
action against HUD, they are dismissed because the Grand Manor
Regulatory Agreement vests HUD with discretion, as opposed to
non-discretionary ministerial duties required to support a
mandamus action.  See 28 U.S.C. § 1361 ("The district courts
shall have original jurisdiction of any action in the nature of
mandamus to compel an officer or employee of the United States
or any agency thereof to perform a duty owed to the
plaintiff."); Heckler v. Ringer, 466 U.S. 602, 616 (1984) ("The

29

### C.

Berkadia has moved to dismiss the claim in the Third Party Complaint seeking an order directing Berkadia to "avail itself of its rights" under section 5 of the mortgage and apply for the appointment of a receiver.  (Third Party Compl. ¶ 44.)[17]  The Hamilton Third Party Plaintiffs, relying on no authority, argue that although they are the mortgagors, they may compel the appointment of a receiver by the mortgagee.  Because the right to seek the appointment of a receiver belongs exclusively to Berkadia, the claim is dismissed.

The Third Party Complaint seeks an order compelling Berkadia, a contractual counterparty, to seek the appointment of

---

common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff . . . only if the defendant owes him a clear nondiscretionary duty."); Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978);  see also Falzarano v. United States, 607 F.2d 506, 512-13 (1st Cir. 1979) (dismissing mandamus action by tenants "challenging the pervasive failure of HUD to enforce its own regulations" because "[o]nly when the duty is clear and unmistakable is the extraordinary remedy of mandamus appropriate.").

[16] Grand Manor also moved to dismiss the claims in the Third Party Complaint against HUD because the claims are not "ripe." Because the claims against HUD are dismissed for the reasons explained above, it is unnecessary to reach Grand Manor's arguments regarding ripeness.

[17] Although all claims against HUD have been dismissed and there is not complete diversity between the Hamilton Third Party Plaintiffs and Berkadia, because the fully briefed state law claim against Berkadia involves a settled question of state law, the Court will exercise supplemental jurisdiction over that state law claim.  See Raucci v. Town of Rotterdam, 902 F.2d 1050, 1055 (2d Cir. 1990).

a receiver.  Under New York law, which applies to the mortgage,[18] in determining whether a party has contractual obligations that may be compelled, the Court must apply "[t]he fundamental, neutral precept of contract interpretation," that "agreements are construed in accord with the parties' intent," Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.), 608 F.3d 139, 146 (2d Cir. 2010) (quoting Greenfield v. Philles Records, Inc., 780 N.E.2d 166 (2002)) (internal quotation marks omitted).  "[W]hen parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms."  Vt. Teddy Bear Co. v. 538 Madison Realty Co., 807 N.E.2d 876, 879 (N.Y. 2004) (quoting W.W.W. Assocs. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990)) (internal quotation marks omitted).  The mortgage provides in clear terms that Berkadia is not obligated to seek the appointment of a receiver.

Under New York law and the express terms of the mortgage, Berkadia has a right, and not an obligation, to seek the appointment of a receiver.  New York Real Property Law provides that:

> In mortgages of real property, . . . the following or similar clauses and covenants must be construed as follows . . . A covenant "that the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver," must be

---

[18] The parties agreed at oral argument that New York law governs the interpretation of the mortgage.

construed as meaning that the <u>mortgagee</u> . . . shall be
entitled . . . to the appointment of a receiver.

N.Y. Real Prop. L. § 254(10) (emphasis added).  Section 5 of the
mortgage provides that "upon default herein, Mortgagee shall be
entitled to the appointment of a receiver by any court having
jurisdiction, without notice, to take possession and protect the
property herein and operate the same and collect the rents,
profits and income therefrom . . . ."  (Mortgage § 5.)  The
language of the mortgage clause is similar to the language in
section 254(10) and grants the right to the appointment of a
receiver only to Berkadia, the mortgagee.  It imposes no
obligation on Berkadia.  Because Berkadia has no contractual
obligation to seek the appointment of a receiver, it cannot be
compelled to do so under New York law.[19]

     The Hamilton Third Party Plaintiffs cite no authority that
would allow the mortgagor to compel the mortgagee to apply for
the appointment of a receiver, and such an interpretation is
belied by the express terms of the contract.  <u>See</u> <u>Seligman v.</u>
<u>Burg</u>, 251 N.Y.S. 689, 692 (App. Div. 1931) (explaining that if
parties to a contract wish to depart from the interpretation
provided by section 254, the parties must use language to
"evince such a contrary intention.").  The only case Hamilton
Equities relies upon involves a mortgagee, not a mortgagor,

---

[19] At oral argument, the Hamilton Third Party Plaintiffs conceded
that there are no cases under New York law in which a mortgagor
has compelled a mortgagee to seek the appointment of a receiver.

seeking the appointment of a receiver, and is therefore inapplicable to the issue in this case.  Citibank N.A. v. Nyland (CF8) Ltd., 839 F. 2d 93, 97 (2d Cir. 1988).   The mortgage clause makes no mention of allowing the mortgagor to seek the appointment of a receiver, nor would such a clause make sense, because the purpose of a receiver is to protect the property after default by the mortgagor.  See Federal Home Loan Mortgage Corp. v. Spark Tarrytown, Inc., 829 F. Supp. 82, 83 (S.D.N.Y. 1993) ("The receiver for the subject property was appointed . . . for the purpose of collecting rents and profits for the benefit and to protect the rights of the . . . mortgagee . . . .").

Moreover, the prerequisite for the mortgagee to seek appointment of a receiver is a default under the mortgage and Berkadia represented at argument that the mortgage is not now in default.  Therefore, construing all the facts in the light most favorable to the Hamilton Third Party Plaintiffs, because seeking the appointment of a receiver is Berkadia's right, the plaintiffs have failed to state a claim and the Third Party Complaint against Berkadia is **dismissed**.

**IV.**

Having dismissed the Interpleader Complaint and the Third Party Complaint, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims, namely the claims asserted by Grand Manor against Hamilton Equities and the counterclaim by Hamilton Equities against Grand Manor, and remands the case to state court.  See 28 U.S.C. § 1367(c)(3); Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F. Supp. 2d 293, 311 (S.D.N.Y. 2004) (collecting cases).  The Court of Appeals for the Second Circuit has instructed that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).  "[W]hen a district court declines to exercise jurisdiction over state-law claims in a removed case, the Court may either remand or dismiss the state-law claims." Maddaloni Jewelers, 354 F. Supp. 2d at 311.

This case presents no basis for deviating from the balance articulated in Valencia.  While the Court of Appeals for the Second Circuit has upheld the exercise of supplemental

34

jurisdiction over state-law claims when federal claims are dismissed on the eve of trial, this is not such a case.  See Valencia, 316 F.3d at 305-06 (citing Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1191-92 (2d Cir. 1996) (exercise of supplemental jurisdiction proper when federal claim dismissed just nine days before trial) and Raucci, 902 F.2d at 1055 (supplemental jurisdiction proper when case was ready for trial at the time federal claims were dismissed)).  Here, the case is not on the eve of trial, and there is no basis for retaining jurisdiction over the purely state law claims asserted in the original complaint and counterclaim that were filed in state court.  The Grand Manor Complaint and Hamilton Equities' counterclaim are therefore remanded to the New York State Supreme Court, Bronx County, from which they were removed.[20]

### CONCLUSION

The Court has considered all of the arguments of the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the foregoing reasons, **the Clerk of Court is directed to enter**

---

[20] After oral argument on the pending motions, Grand Manor sought the opportunity to file an amended complaint in an attempt to remedy the apparent absence of a federal question.  However, Grand Manor has withdrawn that request.  The Court invited all parties to submit arguments against the Court's declining to exercise supplemental jurisdiction over the Grand Manor complaint and the Hamilton Equities counterclaim.  No party objected.

**judgment dismissing the Interpleader Complaint and the Third Party Complaint, and remanding Grand Manor's Complaint and Hamilton Equities' counterclaim to the New York State Supreme Court, Bronx County.[21]** Any applications for costs and attorneys' fees should be made within fourteen days of the entry of judgment. <u>See</u> Fed. R. Civ. P. 54(d). **The Clerk is directed to close this case on the docket of this Court and to close all pending motions.**

SO ORDERED.

Dated:     New York, New York
           April 23, 2013                    _____/s/_____
                                                     John G. Koeltl
                                             United States District Judge

---

[21] To the extent it may be necessary, the Court finds no just reason for delaying the entry of judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure despite the continuation of the state law claims in the New York State Supreme Court. <u>See</u> <u>Jericho Grp., Ltd. v. Midtown Dev., L.P.</u>, No. 07 Civ. 1792, 2008 U.S. Dist. LEXIS 52706 (S.D.N.Y. May 22, 2008).